**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                                    :
HACKENSACK UNIVERSITY                 :
MEDICAL CENTER,                               :
                                                    :
                        Plaintiff,              :          Civ. Action No. 08-0625 (SDW)
                                                    :
                                                    :
            v.                                     :
                                                    :          **OPINION**
                                                    :
CHARLES E. JOHNSON, Acting         :
Secretary, Health and Human Services,   :          July 17, 2009
                                                    :
                                                    :
                        Defendant.            :
_____       :

**Wigenton**, District Judge

        Before this Court is Plaintiff's, Hackensack University Medical Center

("Hackensack" or "Plaintiff"), Motion for Summary Judgment and Defendant's, Charles

E. Johnson ("Secretary" or "Defendant"), Cross-Motion for Summary Judgment pursuant

to Fed. R. Civ. P. 56(c). This Court has jurisdiction pursuant to 28 U.S.C. § 1332(2).

Venue is proper pursuant to 28 U.S.C. § 1391(b). This Court, having considered the

parties' submissions, decides this matter without oral argument, pursuant to Fed. R. Civ.

P. 78. For the reasons stated below, this Court **Denies** Plaintiff's Motion for Summary

Judgment and **Grants** Defendant's Cross-Motion for Summary Judgment.

**Background**

        Defendant, Charles E. Johnson, is the Acting Secretary of the Department of

Health and Human Services ("HHS") and is responsible for distributing Medicare

payments. The Secretary delegates this responsibility to the Center for Medicare and Medicaid Services ("CMS"), an agency within HHS. Hackensack is a not-for-profit acute-care teaching hospital that receives Medicare payments under the Prospective Payment System ("PPS") and receives reimbursement for certain costs associated with its medical education program pursuant to the Medicare Act.

In February 1997, United Hospital[1] ("United") declared bankruptcy and permanently closed. At that time, United had 49.5 full-time equivalent ("FTE") residents rotating through its facility as part of the University of Medicine and Dentistry of New Jersey's ("UMDNJ") residents training programs. The residents were not designated as belonging to United; they generally rotated between several hospitals to complete their academic program. Each academic year begins on July 1 and ends on June 30. UMDNJ ultimately reassigned the displaced residents to UMDNJ, Morristown Memorial Hospital, St. Michael's Medical Center, and Hackensack.

The above hospitals began negotiating what eventually became known as the "Agreement for an Aggregated Count of Residency Positions" ("Agreement"). The Agreement specified the number of residents who were at all hospitals participating in the UMDNJ residency program as of December 31, 1996. It further provided that UMDNJ would absorb the cost of 49.5 of the 85 residents displaced by United as of December 31, 2006. Specifically, the Agreement stated: "[i]t is agreed to reallocate those 49.5 New Jersey Medical School positions to the [remaining hospitals]." The Agreement allocated 12 of those 49.5 positions to Hackensack for the 1997 and 1998 academic years. The Agreement was signed by representatives of UMDNJ, Morristown Memorial Hospital,

---

[1] United is not a party to this matter.

St. Michael's Medical Center, and Hackensack; United did not sign. Although undated, it is undisputed that the Agreement was entered into in June of 1998.

The Agreement was submitted to the Intermediary in July of 1998.[2] The Intermediary requested guidance from CMS regarding how to handle payment for the affected providers. Hackensack also sought to permanently increase its number of FTE's in fiscal year 1996 by 12.

In a letter dated December 15, 1998, CMS explained that although the Balanced Budget Act of 1997 ("BBA") limits the number of residents a hospital may count, the BBA permitted the Secretary to develop rules allowing hospitals which are members of the same affiliated group to apply the cap on an aggregated basis. CMS indicated that members of an affiliated group are permitted to reallocate their aggregate FTEs under the 1996 FTE cap but the agreements must meet the requirements specified in the preamble to the regulations at 63 Fed. Reg. 26341 (May 12, 1998). CMS noted that the Agreement was not signed by United and therefore, the group could not include United's residents in the aggregate cap.

Because the Agreement did not meet the minimum requirements of an affiliation agreement, the Intermediary did not allow a permanent increase of 12 FTE's to Hackensack's fiscal year 1996 base year cap and initially did not allow for a temporary adjustment.

In January 2003, Hackensack appealed the Intermediary's decision. On November 24, 2003, after Hackensack's appeal, the Intermediary granted a temporary adjustment of

---

[2] Medicare payments to hospitals are commonly made by Medicare fiscal intermediaries, acting as agents of the Secretary pursuant to contracts with him. An intermediary is assigned to each Medicare-participating hospital. Blue Cross and Blue Shield of New Jersey ("BCBSNJ") was the Medical Center's Medicare fiscal intermediary until August 1, 2000, when Riverband Government Benefits Administrator ("Riverband") assumed that role. Thus, "Intermediary" throughout this Opinion refers to either BCBSNJ or Riverband.

4.74 FTEs for Indirect Medical Education ("IME") costs and 4.38 FTEs for Direct Graduate Medical Education ("DGME") costs claimed by Hackensack for United residents it accommodated in fiscal year 1998. The Intermediary arrived at these amounts by: 1) verifying that Hackensack's 1998 FTE amount exceeded the 1996 base year cap amount; 2) reviewing the DGME/IME audit documents of United for fiscal year ending February 17, 1997; 3) comparing the interns' and residents' names from United's February 1997 rotation schedule to Hackensack's rotation schedules; and 4) accumulating a list of the matching names. Said computation resulted in a temporary increase of 4.74 FTEs for IME and 4.38 FTEs for DGME purposes.

Plaintiff appealed the revised Notice of Program Reimbursement with the temporary adjustment to the Provider Reimbursement Review Board ("PRRB"). The PRRB held a hearing on February 28, 2006. The PRRB rendered its decision on December 3, 2007, affirming the decision of the Intermediary. In its decision, the PRRB held that the Agreement does not meet the definition of an "affiliation agreement." The PRRB noted that United did not exist at the time of the Agreement and consequently could not have entered into an agreement with the other hospitals; it is impossible for individual residents to work at each of the hospitals in the affiliated group when one of the hospitals is closed.

The PRRB also agreed with the Intermediary regarding the temporary adjustment made to Hackensack's fiscal year 1996 cap. The PRRB was unable to determine which residents would be affected during the remainder of the 1996-1997 academic year or during Hackensack's 1998 fiscal year; the PRRB sustained the methodology used by the Intermediary to determine the temporary adjustment to Hackensack's resident cap.

The PRRB found that the Intermediary's methodology was the most adequate solution for determining which residents were displaced by the closure of United because the rotation schedules proffered by Hackensack frequently changed and Hackensack did not provide any other basis to determine which residents may have rotated through United in the remainder of the 1996-1997 and subsequent academic years.

On January 31, 2008, the CMS Administrator gave notice that he was declining to review the PRRB's decision.

On February 1, 2008, Hackensack filed a complaint, in the District of New Jersey, seeking additional Medicare payments for fiscal year 1998. Both Plaintiff and Defendant now move for summary judgment.

## Summary Judgment

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 318 (1986).

Once the moving party meets the initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may

not rest upon the mere allegations or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). The court may not weigh the evidence and determine the truth of the matter but rather determine whether there is a genuine issue as to a material fact. *Anderson*, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the nonmoving party. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991).

**Discussion**

### A.   STATUTORY PURPOSE OF THE RESIDENT CAPS

Hackensack alleges that the Secretary's refusal to grant a permanent increase to teaching hospitals that take on residents from closed hospitals undermines the statutory purpose of the "cap." The Secretary argues that Hackensack's claim that his decision undermines the statutory purpose of the "cap" is unsupported by legislative history and ignores the deference due to the Secretary.

In 1997, Congress "capped" the number of FTE residents a hospital can claim for Medicare DGME and IME payment purposes at the number of FTE residents in the hospital's "base year" of fiscal year 1996[3]. See § 4623 of the BBA, Pub. L. No. 105-33 (August 5, 1997). The BBA states in pertinent part:

> [F]or purposes of a cost reporting period beginning on or after October 1, 1997 the total number of full-time equivalent residents … may not exceed the number of such full-time equivalent residents for the hospital's most recent cost reporting period ending on or before December 31, 1996.

BBA § 4623 (codified at 42 U.S.C. § 1395ww(h)(4)(H)).

The BBA's legislative history notes that:

---

[3] Congress also enacted a voluntary resident reduction program as part of the BBA. 42 U.S.C. § 1395ww(h)(6) authorizes incentive payments for hospitals that carry out plans to reduce their total residents by five percent or more.

The conference agreement provides for a "cap" or limit on the number of residents that may be reimbursed by the Secretary, on a national and facility level, both in this section and in an earlier provision on indirect medical education payments…[T]he Secretary's flexibility is limited by the conference agreement that the aggregate number of FTE residents should not increase over current levels.

H.R. Conf. Rep. 105-217, 1997 U.S.C.C.A.N. 176, 442.

The House Committee Report states that: "Hospitals have little incentive to reduce the size of their residency programs because they receive large Medicare payments for each resident." H.R. Rep. 105-149, at 1366. The Report goes on to state that Congress is "concerned that absent such an aggregate cap, there may be room for gaming through trading or even possible sales of residency positions to other sites." *Id*. Consequently, Congress enacted a voluntary resident reduction program as part of the BBA. 42 U.S.C. § 1395 ww(h)(6) authorizes incentive payments for hospitals that carry out plans to reduce their total residents by five percent or more.

Although the BBA was enacted to help control costs, the BBA recognizes the need to provide for aggregate resident programs. To that end, BBA § 4623 states, in pertinent part, that: "[T]he Secretary may prescribe rules which allow institutions which are members of the same affiliated group (as defined by the Secretary) to elect to apply the limitation of subparagraph (F) on an aggregate basis." 42 U.S.C. § 1395ww(h)(4)(H)

The Secretary initially implemented BBA § 4623 in a final rule that went into effect on October 1, 1997. *See* 62 Fed. Reg. 45, 966 et seq. (August 29, 1997). The final rule defined the term "affiliated group" as: "[T]wo or more hospitals located in the same urban or rural area … or in contiguous areas if individual residents work at each of the hospitals during the course of the program…" 63 Fed. Reg. at 26, 36 codified at 42 C.F.R. § 413.86(b)(1)(1998).

This Court finds that the Secretary's decision to forego a permanent exception to the resident "cap" imposed by the BBA is consistent with the statutory purpose of the "cap." Congress clearly intended to limit the number of residents for which the Secretary would reimburse hospitals. In fact, Congress plainly states in the Committee Report that: "the Secretary's flexibility is limited by the conference agreement that the aggregate number of FTE residents should not increase over current levels." *See* H.R. Conf. Rep. 105-217, 1997 U.S.C.C.A.N. 176, 442. Said limitation is extended on both the "national and facility level." *Id*. This language cannot reasonably be read to mean that the Secretary had powers to permanently increase the number of residents in any hospitals. In fact, had the Secretary allowed for a permanent increase in the number of FTE residents granted, he would have granted an exception beyond the scope of the limited power granted to him by Congress. The BBA does not allow the Secretary to permanently increase a facility's FTE residents; in fact, he is specifically prohibited from doing so. Moreover, Congress enacted an incentive for hospitals to reduce the number of residents by five percent. Again, this is in line with the clear statutory purpose of the BBA – to limit or cap the number of residents, on a national and facility level, reimbursed by Medicare.

Moreover, Plaintiff's argument – that to allow a permanent increase is in line with the purpose of the BBA – is without merit. The BBA permitted a cap exception for hospitals which share residents on an aggregate basis; however, the Secretary is empowered with broad discretion to define what constitutes an aggregation agreement. The Secretary defined the term "affiliated group" as: "[T]wo or more hospitals located in the same urban or rural area … or in contiguous areas if individual residents work at each of the hospitals during the course of the program…" 63 Fed. Reg. at 26, 36 codified at 42

C.F.R. § 413.86(b)(1)(1998). The Secretary's definition contemplates several hospitals sharing their residents, *i.e.* if 3 hospitals have 10 residents each for a total of 30 residents, they can agree to share all 30 residents. The Secretary's definition does not contemplate a situation whereby only 2 of those 3 hospitals agree to share the 30 residents without participation from the third hospital. If the Secretary's definition would allow for the 2 hospitals to divide the residents of the original 3 hospitals, the Secretary's definition would not address the legislator's "concern that absent … an aggregate cap, there may be room for gaming through trading or even possible sales of residency positions to other sites." H.R. Rep. 105-149, at 1366.

The Agreement in question, although it attempts to disburse residents displaced by the closing of United, is not signed by United. In other words, the Agreement attempts to permanently increase the number of FTE's at each hospital. This results in the same effect as trading or selling residency positions from United to Hackensack, which is expressly forbidden by the BBA. There is no agreement to share residents, only to send the residents from United to Hackensack on a permanent basis. This is contrary to the mandate of the BBA – to cap the number of residents at any one hospital, excepting those who chose to share residents amongst themselves. Therefore, this Court finds the Secretary's decision to forego a permanent exception to the "cap" imposed by the BBA is in accord with the statutory purpose of the BBA and within the authority placed upon the Secretary by the BBA. Thus, Plaintiff's Summary Judgment Motion regarding same is denied.

**B.     PERMANENT INCREASE**

Plaintiff alleges that the Secretary's decision to forego an exception which allows for a permanent increase in the number of FTE DGMEs and IMEs, due to United's closure, is arbitrary and capricious. Defendant disagrees and asks this Court to uphold the decision of the PRRB.

This Court must determine whether the Secretary's refusal to permit a permanent exception to Plaintiff's FTE DGMEs and IMEs, due to United's closure, was arbitrary and capricious, an abuse of discretion, not based on substantial evidence, or otherwise in accordance with law. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414-17 (1971).

In the case at bar, this Court finds that the Secretary's decision denying a permanent increase to the number of FTEs for Plaintiff was not arbitrary or capricious. As determined herein, it is beyond the Secretary's authority to create a permanent exception to the cap imposed by the legislature in the BBA. Therefore, as it pertains to the permanent exception, Plaintiff's Motion for Summary Judgment is denied; Defendant's Cross-Motion for Summary Judgment is granted.

**C.     TEMPORARY INCREASE**

Plaintiff alleges that the Secretary's methodology used to calculate the temporary increase is insupportable for several reasons: (1) it fails to provide complete recovery for the costs actually incurred; (2) the methodology was unexplained; and (3) is facially irrational. Defendant, on the other hand, argues that the decision of the PRRB was reasonable and logical given the documentation provided by Hackensack.

This Court finds that the Secretary's decision was not arbitrary or capricious. The Secretary's decision was based on the information provided to him. Moreover, apart from simply asserting that the PRRB's decision was arbitrary and capricious, Hackensack has failed to provide evidence in support thereof. Merely disagreeing with the PRRB's decision is not evidencing a decision made without careful consideration of the record, nor is it evidence of a decision made arbitrarily or capriciously. Simply put, Hackensack's argument is insufficient. The PRRB made a decision based on the information before it. The PRRB explained how, given the lack of evidence and the record, it came up with the numbers in its revised notice. On November 24, 2003, the Intermediary issued a revised notice of program reimbursement which increased Hackensack's 1996 base year unweighted FTE count to 111.36 for GME and 116.53 for IME; this included a temporary increase of 4.38 FTEs for GME and 4.74 FTEs for IME. The Intermediary arrived at this number by reviewing United's audit work-papers for fiscal year ending February 17, 1997, and comparing the names of the residents from United's rotation schedule to Hackensack's 1998 rotation schedules and sign-in sheets. (Administrative R. ("AR") 11, 2219.).

The PRRB determined that although the Intermediary's method for calculating the temporary increase was not perfect, it was "reasonable as it represents residents that were directly impacted by the closure." (AR 18.) The PRRB also stated that it could "not find sufficient evidence in the record to indicate that residents who rotated through United earlier in the academic year were displaced. … The PRRB finds that there is insufficient documentation to support an alternative methodology…." (*Id.*)

The PRRB further noted that Hackensack's reliance on United's rotation schedule was unreliable because: (1) it was prepared at the beginning of the academic year and frequently changed; (2) no documentation was provided to determine which hospital the residents actually trained at; and (3) no documentation was provided beyond June 30, 1997. (A.R. 17 – 18.)

Therefore, this Court finds that the Secretary's decision was not arbitrary and capricious. Hence, Plaintiff's Motion for Summary Judgment is **DENIED**, and Defendant's motion is **GRANTED**.

### D.   METHODOLOGY   FOR   CALCULATING   A   TEMPORARY INCREASE/REMAND

Given this Court's determination there is no basis upon which to permit Hackensack's request for remand to obtain further discovery or to review the methodology utilized by the Intermediary. Therefore, Plaintiff's request is **DENIED**.

### Conclusion

For the reasons stated above, Plaintiff's Motion for Summary Judgment is **DENIED**, and Defendant's Motion for Summary Judgment is GRANTED.

s/Susan D. Wigenton, U.S.D.J.

Orig:   Clerk
Cc:    Madeline Cox Arleo, U.S.M.J.
        Parties